## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JTH TAX LLC d/b/a LIBERTY TAX SERVICE f/k/a JTH TAX, INC., <br><br>       Plaintiff, <br><br> v. <br><br> DENNIS DASILVA AND DDS GROUP INC., <br><br>       Defendants. | CIVIL ACTION NO. _____ |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff JTH Tax LLC d/b/a Liberty Tax Service f/k/a JTH Tax, Inc. ("Liberty" or "Plaintiff"), for its Verified Complaint against Defendants Dennis DaSilva ("Mr. DaSilva") and DDS Group Inc. ("DDS"), alleges the following:

## INTRODUCTION

1.      Mr. DaSilva was a Liberty Tax franchisee until Liberty recently terminated his franchise agreement because Defendant owes Liberty more than $500,000 in overdue royalties and loans, and he did not renew his franchise agreement.  Mr. DaSilva operated the franchise business through his company, the co-defendant DDS.   Mr. DaSilva was the sole owner of a Liberty Tax Service® franchise, with a twenty-five mile designated territory in and around Hyannis, Massachusetts (the "Territory"), and a principal office at 1 Barnstable Road, Hyannis, Massachusetts (the "Franchise Location").  Since the termination of the Franchise Agreement, Defendants have continued to operate a tax preparation businesses in competition with Liberty at the former Franchise Location, in violation of the post-termination non-competition and non-solicitation provisions set forth in Mr. DaSilva's Liberty Tax Service® Franchise Agreement.

2.      Further, Mr. DaSilva has refused to honor his contractual commitments to Liberty. Based on his failure to return Liberty's confidential information and operating a competing business out of the Franchise Location, Liberty is informed and believes that Defendants are using Liberty's trade secrets, customer lists, customer email addresses, and other confidential information to call upon and solicit Liberty's customers in the operation of a competing tax preparation business in violation of the post-termination provisions of the Franchise Agreement and applicable Virginia state law.  Liberty seeks an immediate injunction requiring Mr. DaSilva to comply with the post-termination obligations under the Franchise Agreement, and prohibiting him from operating his competing business in violation of his non-competition and non-solicitation covenants.

## PARTIES

3.      Plaintiff Liberty is a Delaware limited liability company with its principal place of business at 1716 Corporate Landing Parkway, Virginia Beach, Virginia 23454.

4.      Defendant Mr. DaSilva is a citizen of the State of Massachusetts, with a last known residential address of 10 Lawton Lane, West Barnstable, Massachusetts 02601.

5.      Defendant DDS Group Inc. is a Massachusetts corporation, with a principal office at 1 Barnstable Road, Hyannis, Massachusetts 02601.

## JURISDICTION AND VENUE

6.      This Court has personal jurisdiction over the Defendants because Mr. DaSilva is a Massachusetts resident and DDS is a Massachusetts corporation.

7.      This Court has original (federal question) subject matter jurisdiction over this claim pursuant to the Defend Trade Secrets Act  of 2016 ("DTSA"), 18 U.S.C. § 1836, *et seq.*, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims under the DTSA.

8.      This Court is the proper venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), because Defendant is a Massachusetts resident and a substantial part of the events or omissions giving rise to the claims occurred in Massachusetts.

## FACTUAL BACKGROUND

**Liberty Franchise System:**

9.      Liberty is the franchisor of Liberty Tax Service® income tax preparation service centers located throughout the United States, including the State of Massachusetts.

10.     Liberty owns the federally-registered Liberty Tax Service® trademarks, service marks, logos and derivations thereof (the "Marks"), and has spent substantial time and money advertising and promoting the distinctive and well-known Liberty Tax Service® system, which sells income tax preparation and filing services and products to the public under the Marks. Franchisees license the Marks pursuant to Franchise Agreement.

11.     Pursuant to the terms of Franchise Agreement, Liberty discloses in confidence certain confidential information and trade secrets, including Liberty's confidential Operations Manual, methods of operation of franchise, customer information and records, and marketing information, to franchisees.

12.     Liberty has grown to be one of the largest tax preparation franchises in the United States.

13.     Liberty plays an important role in the local Virginia Beach, Virginia economy, as well as nation-wide, with a network of over 21,000 tax preparers.

14.     Liberty's busiest time of year are the months of January through April, during which time Liberty generates approximately 90% of its annual revenue.

**Obligations under the Franchise Agreement:**

15.     Mr. DaSilva entered into a franchise agreement with Liberty for the Territory, designated as MA034, in and around Hyannis, Massachusetts, on September 29, 2010.   On August 20, 2015, Mr. DaSilva entered into another franchise agreement for the Territory, effectively renewing the franchise for another five-year term.  A true copy of the August 20, 2015 franchise agreement (the "Franchise Agreement") is attached hereto as Exhibit A.  Mr. DaSilva operated a tax preparation business under the Franchise Agreement (the "Franchised Business") from the Franchise Location, 1 Barnstable Road, Hyannis Massachusetts.     The term of the Franchise Agreement is five years with specific terms for renewal.  *Id.* § 2(a), (b).  Virginia law governs all claims that relate to or arise out of the Franchise Agreement.  Ex. A, § 17(a).

16.     In exchange for Liberty's grant of a franchise allowing him to "operate a tax return preparation business using Liberty's system and Liberty's Marks within the Territory," and specifically at the Franchised Business, Mr. DaSilva agreed to certain obligations while operating under the Franchise Agreement, as well as post-termination.  Ex. A, § 1.

17.     Pursuant to the Franchise Agreement, Liberty provided Mr. DaSilva with training in franchise operation, marketing, advertising, sales, and business systems.  Mr. DaSilva also received a copy of Liberty's confidential operating, marketing, and advertising materials, which are not available to the public or to anyone who is not part of Liberty's business system.  Mr. DaSilva agreed to keep these materials confidential.

18.     In Section 4(d) of the Franchise Agreement, Mr. DaSilva agreed to pay Liberty certain royalties and fees.

19.     Section 6(g) of the Franchise Agreement obligated Mr. DaSilva to "use the software that Liberty provides" and provided that he "may not use, install or have any other federal or state

personal income tax return preparation or electronic filing software on any computer used in the Franchised Business, without Liberty's prior written consent."

20.     Section 9 of the Franchise Agreement sets forth Mr. DaSilva's post-termination obligations, including, *inter alia*, the obligation to immediately: (1) pay Liberty all amounts due; (2) transfer to Liberty all telephone numbers used in relation to the Franchised Business; (3) deliver to Liberty any original and all copies of information containing the names, addresses, e-mail addresses, or phone numbers of customers of the Franchises Business; (4) deliver to Liberty original and all copies of customer tax returns, files and records; (5) return all copies of Liberty's confidential Operations Manual; and (6) adhere to the Franchise Agreement's post-termination non-competition and non-solicitation covenants.

21.     Section 10(a) of the Franchise Agreement is an in-term covenant not to compete, which provides that, during the term of the Franchise Agreement, Mr. DaSilva agreed "not to directly or indirectly, for a fee or charge, in the United States or Canada, prepare or electronically file income tax returns, or offer Financial Products, except, if applicable, in your capacity as a SiempreTax or Liberty Tax Service franchisee pursuant to a valid SiempreTax or Liberty franchise agreement." *See* Ex. A.

22.     Section 10(b) of the Franchise Agreement is a post-termination covenant not to compete, under which: "[f]or a period of two (2) years following the termination, expiration, transfer or other disposition of the Franchised Business . . . [Mr. DaSilva] agree[d] not to directly or indirectly, for a fee or charge, prepare or electronically file income tax returns . . . within the Territory or within a twenty-five (25) miles of the boundaries of the Territory." *See* Ex. A.

23.     Section 10(d) of the Franchise Agreement is a non-solicitation covenant, which Mr. DaSilva agreed that "[f]or a period of two (2) years following the… termination… of the Franchise

Business… [he would] not, within the Territory or within twenty-five (25) miles of the boundaries of the Territory, directly or indirectly, solicit any person or entity served by any of your prior Liberty offices within the last twelve (12) months that [he was] a Liberty franchisee, for the purpose of offering such person or entity, for a fee or charge, income tax preparation, electronic filing of tax returns, or Financial Products." *Id.*

24.     The in-term non-competition covenant contained in Section 10(a) of the Franchise Agreement is necessary to protect Liberty's legitimate, protectable interest in their respective franchise businesses, including but not limited to:

A.     Maintaining and protecting Liberty's goodwill and customer loyalty;

B.     Retaining customer relationships;

C.     Liberty's customer lists, customer identification, tax returns, and other confidential information; and

D.     Preserving Liberty's ability to facilitate the operation of Liberty franchises where the Franchise Location is currently located.

25.     In Section 10(h) of the Franchise Agreement, Mr. DaSilva agreed, "that the provisions of Section 10 are reasonable, valid and not contrary to the public interest."  To that end, Mr. DaSilva agreed to "waive all defenses to the strict enforcement of Section 10," and further agreed that "Liberty is entitled to a temporary restraining order, preliminary and/or permanent injunction for any breach of duties under any of the non-monetary obligations of Sections 9 and 10." *Id.*

26.     In Section 10(i) of the Franchise Agreement, Mr. DaSilva agreed that "[t]he covenants contained in Section 10 shall survive any termination or expiration of this Agreement." *Id.*

27. In Section 12 of the Franchise Agreement, Mr. DaSilva acknowledged that information provided by Liberty to him regarding, among other things, Liberty's Marks, methods, techniques, formats, specifications, procedures, information, systems, and customer and marketing information was confidential, and was to be used only in connection with the operation of the Franchise Locations. *Id.* Pursuant to Sections 12(a) and (c) of the Franchise Agreement, Contreras agreed to refrain from interfering with or attempting to interfere with any of the business relationships or advantages of Plaintiffs and the Marks, and from using for his benefit any confidential information from Plaintiffs' proprietary manuals and business system, following transfer, termination, expiration or nonrenewal of the Franchise Agreement.

**Overdue Royalties and Loan Payments and Guaranty Obligation:**

28. For the past several years, Mr. DaSilva failed to pay royalties due to Liberty under § 4(d) of the Franchise Agreement, resulting in a delinquency of $507,728.21.

29. On September 29, 2010, Mr. DaSilva signed the promissory note attached hereto as Exhibit B (the "Promissory Note"), under which he promised to pay $40,000 plus interest to Liberty as provided in the Promissory Note. Mr. DaSilva defaulted under the Promissory Note, and currently owes at least $13,367, plus continuing interest, under the Promissory Note.

30. On December 11, 2014, Mr. DaSilva signed the Accounts and Notes Receivable Guaranty Agreement attached hereto as Exhibit C (the "Guaranty"), under which Mr. DaSilva guaranteed a $52,500 promissory note that the primary obligor executed in favor of Liberty when that individual purchased from Mr. DaSilva another Liberty franchise business located in Revere, Massachusetts (not the Franchised Location at issue in this action). The primary obligor defaulted under that promissory note and Mr. DaSilva now owes at least $28,508, plus continuing interest, to Liberty pursuant to the Guaranty.

**Termination of the Franchise Agreement:**

31.     The Franchise Agreement term expired on or about August 20, 2020.   On November 19, 2020, Liberty sent a "Notice to Cure Default" to Mr. DaSilva advising that the Franchise Agreement would be terminated if he did not execute renewal documents that Liberty had sent to him.   Liberty also sent separate "Notice to Cure Default" notices based on Mr. DaSilva's breaches of the Franchise Agreement including his failure to pay over $550,000 that he owed Liberty (for overdue royalties, promissory note and guaranty obligations), his failure to submit a budget, his failure to provide Liberty with profit and loss statements, and his failure to properly advertise Liberty services.

32.     On or about December 21, 2020, Liberty terminated the Franchise Agreement by sending Mr. DaSilva a notice pursuant to Section 8(c) of the Franchise Agreement.   A true copy of the Termination Notice is attached hereto as Exhibit D. Liberty reminded Mr. DaSilva of his post-termination obligations, including but not limited to the covenant not to compete, and to return to Liberty all paper and electronic files and customer information.

**Trade Secret Misappropriation, Unfair Competition, and Breach of Non-Competition and Non-Solicitation Covenants:**

33.     Upon the non-renewal and termination of the Franchise Agreement, Mr. DaSilva failed to: (1) pay to Liberty all amounts owning; (2) transfer to Liberty all telephone numbers used in relation to the Franchised Business; (3) deliver to Liberty any original and all copies of information containing the names, addresses, e-mail addresses, or phone numbers of customers of the Franchises Business; (4) deliver to Liberty any original and all copies of customer tax returns, files and records; and (5) return all copies of Liberty's confidential Operations Manual.

34.     On December 18, 2020, Ariana Murrell – the Liberty franchisee for a neighboring territory – visited Mr. DaSilva's former MA034 Franchise Location at 1 Barnstable Road in

Hyannis, and informed Liberty that the office now bore DDS signage.  Ms. Murrell supplied Liberty with photographs, attached hereto as Exhibit E, depicting DDS signage at the former Franchise Location.

35.     Upon information and belief, Mr. DaSilva has at all times maintained possession and control over the office at the Franchise Location.

36.     According to information publicly available from the Massachusetts Secretary of the Commonwealth, Corporations Division, Mr. DaSilva is the President, Treasurer, Secretary and Director of DDS Group Inc.  A true copy of the most recent Annual Report, which DDS filed on October 26, 2020 is attached hereto as Exhibit F.  The principal office of DDS is at the same address as the former Franchise Location.

37.     All commercial tax return businesses are required to have an Electronic Filing Identification Number ("EFIN") issued by the Internal Revenue Service ("IRS") for each business location they own and operate.  An EFIN allows the IRS to monitor, track, and regulate who is electronically filing tax returns.

38.     The IRS publishes a public database of all EFIN in the United States for that tax year.  The database includes the legal name, fictitious name, address, phone number, application submission date, and corresponding tax office return count, among other information.

39.     According to the IRS's database, DDS's registered business address is the Franchise Location and registered phone number at the Franchise Location is 508-790-1543.  This is the same phone number Mr. DaSilva used in connection with the Franchised Business and failed to transfer to Liberty upon termination.

40.     At least as of December 18, 2020, DDS had a website publicly promoting DDS, claiming that "DDS has prepared over 15,000 tax returns," and advertising tax preparation services

at the former Franchise Location.  True copies of screenshots taken of the DDS website are attached hereto as Exhibit G.

41.     In light of their conduct to date, it is clear that Defendants are currently and intend to continue offering electronic filing of tax returns at the Franchise Location, and using Liberty's trade secrets in violation of the non-compete and non-solicitation covenants in the Franchise Agreement.

42.     Upon information and belief, Defendant is currently and will continue to offer electronic filing of tax returns at the former Franchise Location, and use Liberty's trade secrets in violation of the non-compete and non-solicit covenants in the Franchise Agreement.

## COUNT I
### *Breach of the Franchise Agreement*
### *(Equitable Claim)*

43.     Liberty repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

44.     The Franchise Agreement is valid and enforceable.

45.     Liberty has performed every obligation and condition required under the Franchise Agreement.

46.     In Section 6(g) of the Franchise Agreement, Mr. DaSilva agreed that all computers used in the Franchised Business would only use Liberty's software for preparing and electronically filing tax returns.  *See* Ex. A § 6(g).

47.     In Sections 9 and 10 of the Franchise Agreement, Mr. DaSilva agreed to post-termination obligations, including non-compete and non-solicitation covenants.  *See* Ex. A.

48.     Upon termination of the Franchise Agreement, Mr. DaSilva failed to transfer to Liberty the phone numbers used in connection with the Franchised Business, return to Liberty the

confidential Operations Manual, and deliver to Liberty all copies of customer records and information.

49.     On information and belief, Mr. DaSilva has used, and continues to use, Liberty's Operations Manual and customer records to solicit customers to accept tax preparation services after the term of the Franchise Agreement.

50.     As set forth in paragraphs 32-42 above, since termination of the Franchise Agreement, Mr. DaSilva has operated a tax return preparation business at the former Franchise Location, in violation of the post-termination non-competition and non-solicitation provisions to which he agreed.

51.     Each of Mr. DaSilva's foregoing breaches constitute a material breach of the Franchise Agreement.

52.     As a direct and proximate result of these breaches, Liberty has incurred and will continue to incur substantial losses, fees, and expense for which Mr. DaSilva is liable.

53.     As a result of Mr. DaSilva's past, present, and potential breaches, Liberty has suffered and in the absence of an injunction will continue to suffer actual, substantial, and irreparable damages, including but not limited to:

>    A.     Loss of customer goodwill and loyalty;
>
>    B.     Loss of business opportunities and relationships to provide tax preparation services and related services;
>
>    C.     Loss of customers;
>
>    D.     Loss of profits;
>
>    E.     Loss of franchisee stability;
>
>    F.     Loss of ability to sell other franchises;
>
>    G.     Loss of value in confidential business information;

H.     Loss of competitive advantage in the Territory, in and around Hyannis, Massachusetts;

I.      Attorneys' fees; and

J.      Cost of this action.

54.     Liberty has been and will be irreparably harmed by Mr. DaSilva's actions, and monetary damages are an insufficient remedy in that it can only potentially quantify a limited loss of customers, but cannot take into account the continuing irreparable damage to the value of Liberty's Confidential Information, goodwill, customer loyalty, and its ability to sell franchises, all of which are caused by Mr. DaSilva's ongoing violations.

55.     Unless his wrongful conduct is enjoined, Mr. DaSilva is likely to continue to breach his obligations by continuing to breach the non-competition and non-solicitation covenants, continuing to use non-Liberty software on Franchised Business computers, and continuing to disclose and use Liberty's Confidential Information.

56.     Mr. DaSilva's wrongful conduct is imputed to DDS, the company which he controls and through which he is operating his competing tax return preparation business, so DDS also should be enjoined from continuing to participate in Mr. DaSilva's breaches of his non-competition and non-solicitation obligations.

## COUNT II
### *Breach of the Franchise Agreement (Monetary Claim)*

57.     Liberty repeats and re-alleges the foregoing paragraph as if fully set forth herein.

58.     Mr. DaSilva breached § 4(d) of the Franchise Agreement by failing to pay royalties due to Liberty under that provision, resulting in a delinquency of $507,728.21.

59.     Pursuant to Sections 9(k) and 10 of the Franchise Agreement, Mr. DaSilva agreed to the in-term and post-term non-competition and non-solicitation covenants.  *See* Ex. A.

60.     Mr. DaSilva has been and is currently competing against Liberty and soliciting customers at the Franchise Location, and then preparing and electronically filing income tax returns on Franchised Business computers.

61.     Mr. DaSilva has and will continue to solicit Liberty's clients using the confidential client contact information and records that Mr. DaSilva failed to deliver to Liberty in violation of Section 9(g) and (h) of the Franchise Agreement.

62.     Each of Mr. DaSilva's foregoing breaches constitute a material breach of the Franchise Agreement.

63.     As a direct and proximate result of Mr. DaSilva's breaches of Sections 9(k), 10(a), and 10(b) of the Franchise Agreement and Section 5 of the Mutual Termination Agreement, Liberty has suffered and will continue to suffer damages in an amount to be proven at trial, for which Mr. DaSilva is liable, including but not limited to, compensatory damages, consequential damages, and disgorgement of Mr. DaSilva's profits.

### COUNT III
### *Breach of Promissory Note*

64.     Liberty repeats and re-alleges the foregoing paragraph as if fully set forth herein.

65.     On September 29, 2010, Mr. DaSilva signed the promissory note attached hereto as Exhibit B (the "Promissory Note"), under which he promised to pay $40,000 plus interest to Liberty as provided in the Promissory Note.

66.     Mr. DaSilva breached and defaulted under the September 29, 2010 Promissory Note.

67.     Mr. DaSilva breach of the September 29, 2010 Promissory Note has damaged Liberty, as Mr. DaSilva currently owes Liberty at least $13,367, plus continuing interest, under the Promissory Note.

## COUNT IV
### *Guaranty Obligation*

68.     Liberty repeats and re-alleges the foregoing paragraph as if fully set forth herein.

69.     On December 11, 2014, Mr. DaSilva signed the Accounts and Notes Receivable Guaranty Agreement attached hereto as Exhibit C (the "Guaranty"), under which Mr. DaSilva guaranteed a $52,500 promissory note that the primary obligor executed in favor of Liberty when that individual purchased from Mr. DaSilva another Liberty franchise business located in Revere, Massachusetts (not the Franchised Location at issue in this action).

70.     The primary obligor defaulted under that promissory note, and Mr. DaSilva has not satisfied his obligations under the Guaranty.

71.     Mr. DaSilva failure to satisfy his obligation under the Guaranty has damaged Liberty, and Mr. DaSilva currently owes at least $28,508, plus continuing interest, to Liberty under the Guaranty.

## COUNT V
### *Violation of Defend Trade Secrets Act of 2016*

72.     Liberty repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

73.     The Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, provides a private civil action for the misappropriation of a trade secret that is related to a product or service used in, or intended for use in, interstate or foreign commerce.

74.     Liberty owns numerous trade secrets, including but not limited to, their respective Operations Manuals, training manuals, training programs, methods of operation, marketing strategies, marketing programs, customer lists, and customer information.

75.     Each of Liberty's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

76.     Liberty's trade secrets are not readily ascertainable by the public as they are disclosed only to franchisees in the operation of a franchised business pursuant to a franchise agreement.

77.     Franchisees are licensed to use the trade secrets only pursuant to the Franchise Agreement in the operation of a Liberty franchise to provide paid tax preparation and related services for customers.

78.     During Mr. DaSilva's operation of the Franchised Business, Liberty disclosed its trade secrets to Mr. DaSilva for the sole purpose of operating the Franchised Business pursuant to the Franchise Agreement.

79.     Liberty has taken extensive measures to preserve and protect these trade secrets for the purpose of maintaining their competitive advantage in the marketplace.

80.     The Franchise Agreement explicitly provide for the protection of the above referenced trade secrets, including requiring the delivery of all originals and copies of the confidential Operations Manual and customer lists and records to Plaintiff upon expiration, termination, or nonrenewal of the Franchise Agreement, requiring former franchisees and their representatives to maintain the confidentiality of the information, and requiring former franchisees and their representatives to never use the information for any purpose other than operating a franchised business pursuant to the Franchise Agreement.

81.     Pursuant to Section 9(i) of the Franchise Agreement, Mr. DaSilva agreed that upon termination of the Franchise Agreement, he would never use, disclose, or permit the use or

disclosure of Liberty's trade secrets in any manner whatsoever, and that he would return all confidential information including trade secrets upon termination.

82. Mr. DaSilva has failed to return Liberty's confidential and proprietary information and trade secrets including, but not limited to, their Operations Manual and all updates thereto and all copies of customer lists, contact information, and records.

83. Based on his failure to return Liberty's confidential information and operating out of the former Franchise Location, Liberty is informed and believes that Mr. DaSilva has used and is using Liberty's confidential information and trade secrets during and after the termination of the Franchise Agreement in connection with tax preparation done to divert revenues from Liberty, and Liberty has not and would not consent to or authorize such use.

84. Mr. DaSilva misappropriated and/or disclosed Liberty's trade secrets for his own economic benefit and with the intention and knowledge that his conduct would injure Liberty by, for example, causing Liberty to lose any customers successfully solicited by Defendants.

85. As a direct and proximate result of Mr. DaSilva's willful, improper, and unlawful disclosure and use of Liberty's trade secrets, Liberty has suffered and will continue to suffer irreparable injury.

86. Pursuant to 18 U.S.C. § 1836(b)(3)(A), Defendants' actual and threatened use and misappropriation of Liberty's trade secrets should be enjoined from further disclosure or use of Liberty's trade secrets.

87. Defendants' misappropriation of Plaintiffs trade secrets was and continues to be willful and malicious - warranting an award of exemplary damages in accordance with 18 U.S.C. § 1836(b)(3)(C) and an award of reasonable attorneys' fees in accordance with 18 U.S.C. § 1836(b)(3)(D).

88.     Liberty further is entitled to a civil seizure remedy under the DTSA, and request that the Court enter an order providing for the seizure of Liberty's property, including Liberty's Operations Manual and any updates thereto and Liberty's customer records and information.

**COUNT VI**
***Common Law Conversion***

89.     Liberty repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

90.     Liberty owns and has the right to possess the following properties by virtue of the Franchise Agreement:

A.      Any copies, including electronic copies and media, of lists and other sources of information containing the names, addresses, e-mail addresses, or phone numbers of customers who patronized the Franchised Business;

B.      Any copies, including electronic copies and media, containing, customer tax returns, files, and records; and

C.      The copy of the Operations Manual and any updates.

91.     Mr. DaSilva was authorized to use and possess the aforementioned property while operating the former Franchised Businesses pursuant to the Franchise Agreement.

92.     Pursuant to Section 9 of the Franchise Agreement, upon termination of the Franchise Agreement, Mr. DaSilva was required to transfer and deliver all of the aforementioned property to Liberty.  *See* Ex. A.

93.     As of the date of this filing, Mr. DaSilva has not returned the confidential Operations Manual and any updates thereto, copies of Liberty's customer records, lists, and information.  As such, Mr. DaSilva is intentionally interfering with Liberty's use and enjoyment of its property.

94.     Mr. DaSilva has converted Liberty's property for his financial gain through the solicitation of Liberty's customers to compete directly with Liberty for tax preparation services.

95.     Mr. DaSilva's interference with Liberty's property by not transferring or delivering it to Liberty has deprived Liberty of its possession and use of the aforementioned property.

96.     As a direct and proximate result of Mr. DaSilva's conversion of Liberty's property, Liberty has suffered damages and will continue to suffer damages, for which Mr. DaSilva is liable, until the aforementioned property is delivered and returned to Liberty.

**COUNT VII**
***Unfair Competition***

97.     Liberty repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

98.     Defendant improperly uses and will likely continue to use Liberty's Confidential Information in furtherance of his tax preparation business, which competes with Liberty out of the former Franchise Location, and uses the same computers as the former Franchised Business.

99.     Defendant is intentionally attempting to deceive Liberty's current and prospective customers for Defendants' business gain.

100.    As a direct and proximate result of Defendant's actions, Liberty has suffered and will continue to suffer irreparable injury and is entitled to monetary damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Liberty prays for judgment against Defendant Dennis DaSilva as follows:

1.      For the following injunctive relief:

    A.      Enjoin Defendants from directly or indirectly, for a fee or charge, preparing or electronically filing income tax returns, or offering Financial Products (as defined in the Franchise Agreement), within the Territory (as defined in the Franchise Agreement) or within twenty-five (25) miles of the boundaries of the Territory;

    B.      Enjoin Defendants from directly or indirectly soliciting any person or entity served by any of their prior Liberty offices within the last twelve (12) months that they were a Liberty franchisee, for the purpose of offering such

18

person or entity, for a fee or charge, income tax preparation, electronic filing of tax returns, or Financial Products (as defined in the Franchise Agreement);

C.      Enjoin Defendants from using or disclosing any of Liberty's Confidential Information (as defined in Section 12 of the Franchise Agreement), including without limitation, methods of operations, customer information, and marketing information;

D.      Order Defendants to transfer to Liberty all telephone numbers, listings and advertisements used in relation to the Franchised Business;

E.      Order Defendants to deliver to Liberty any original and all copies, including electronic copies and media, of lists and other sources of information containing the names, addresses, e-mail addresses, or phone numbers of customers of the Franchised Business;

F.      Order Defendants to deliver to Liberty any original and all copies, including electronic copies and media, containing customer tax returns, files, and records;

G.      Order Defendants to deliver to Liberty all copies of the confidential Operations Manual and any updates;

H.      Enjoin Defendants, and all those acting by, through, or in concert with them, by immediate and permanent injunction, from using Liberty's intellectual property, including but not limited to its trademarks and trade dress, and from otherwise engaging in unfair competition with Liberty;

I.      Order Defendants, and all those acting by, through, or in concert with them, by immediate and permanent injunction, to comply with the post-termination obligations set forth in the Franchise Agreement; and

J.      Order Defendants, and all those acting by, through, or in concert with them, by immediate and permanent injunction, to comply with the non-compete and non-solicitation provisions set forth in the Franchise Agreement.

2.      For an accounting of Defendant's revenues and profits for all tax return preparation and electronic filing performed since January 1, 2018;

3.      For a monetary award against Defendants in an amount to be proven at trial, including, but not limited to, compensatory damages, expectancy damages, punitive damages, and disgorgement of profits;

4.      For a monetary award against Mr. DaSilva for Liberty's attorneys' fees and costs,

in an amount to be proven at trial;

5.      For pre- and post-judgment interest; and

6.      For such other relief as the Court deems just and appropriate.


Date:  December 29, 2020.

Respectfully Submitted,

**PLAINTIFF   JTH   TAX   LLC   D/B/A
LIBERTY TAX SERVICE**

By its attorneys,

*/s/ James L. Messenger*
James L. Messenger, BBO #547236
jmessenger@grsm.com
John W. Moran, BBO #664914
jmoran@grsm.com
Brian J. Wall, BBO #688278
bwall@grsm.com
857-263-2000
Gordon Rees Scully Mansukhani, LLP
21 Custom House Street, 5th Floor
Boston, MA 02110


Peter G. Siachos (Of Counsel)
psiachos@grsm.com
Gordon Rees Scully Mansukhani, LLP
18 Columbia Turnpike
Suite 220
Florham Park, NJ 07932
973-549-2500

## <u>VERIFICATION</u>

Cliff Birnbaum, being duly sworn, deposes and says:

I am Regional Director for JTH Tax LLC d/b/a Liberty Tax Service f/k/a JTH Tax, Inc. ("Liberty"). I read the foregoing Verified Complaint, know the contents thereof, and state the factual allegations are true and correct. I base this Verification on my own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true and correct. The grounds of my knowledge, information, and belief are derived from my position as Regional Director at Liberty, my personal involvement in the events underlying this litigation, and general investigation of the facts and circumstances described in the Verified Complaint, including, without limitation, my review of Liberty's records and conversations with Liberty's employees.

DocuSigned by:

3A79B8B6B10F47C...

Cliff Birnbaum
Regional Director for JTH Tax LLC d/b/a
Liberty Tax Service f/k/a JTH Tax, Inc.